# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

_____

No.    23-2026
_____

JOHN COHEN, as next friend and personal representative of the Estate of Eric Cohen,

Plaintiff – Appellant,

v.

CITY OF PORTLAND; CHRISTOPHER GERVAIS, individually and in his official capacity as Sergeant, Portland Police Department; MICHAEL RAND, individually and in his official capacity as Sergeant, Portland Police Department; RONALD GIROUX, JR., individually and in his official capacity as a Fireman, Portland Fire Department,

Defendants – Appellees

_____

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF MAINE

_____

## BRIEF OF APPELLEES

Kasia S. Park, Bar No. 1173974
Susan M. Weidner, Bar No. 1207944
DRUMMOND WOODSUM
84 Marginal Way, Suite 600
Portland, ME  04101-2480
Tel: (207) 772-1941
_Counsel for Defendants/Appellees_
_City of Portland, Christopher_
_Gervais, Michael Rand, and Ronald_
_Giroux, Jr._

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

_____

## No.    23-2026
_____

JOHN COHEN, as next friend and personal representative of the Estate of Eric Cohen,

Plaintiff – Appellant,

v.

CITY OF PORTLAND; CHRISTOPHER GERVAIS, individually and in his official capacity as Sergeant, Portland Police Department; MICHAEL RAND, individually and in his official capacity as Sergeant, Portland Police Department; RONALD GIROUX, JR., individually and in his official capacity as a Fireman, Portland Fire Department,

Defendants – Appellees

_____

## ON APPEAL FROM THE UNITED STATES
## DISTRICT COURT FOR THE DISTRICT OF MAINE

_____

## BRIEF OF APPELLEES

Kasia S. Park, Bar No. 1173974
Susan M. Weidner, Bar No. 1207944
DRUMMOND WOODSUM
84 Marginal Way, Suite 600
Portland, ME  04101-2480
Tel: (207) 772-1941
_Counsel for Defendants/Appellees_
_City of Portland, Christopher_
_Gervais, Michael Rand, and Ronald_
_Giroux, Jr._

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION ...............................................................................1

STATEMENT OF THE ISSUES...............................................................1

STATEMENT OF THE CASE.................................................................2

   I.   PROCEDURAL HISTORY ...........................................................2

   II.  STATEMENT OF FACTS ...........................................................3

      A.  Motion to Dismiss Facts.....................................................3

      B.  Motions for Summary Judgment Facts .................................6

SUMMARY OF THE ARGUMENT .....................................................11

STANDARD OF REVIEW ..................................................................13

   I.   MOTION TO DISMISS ...........................................................13

   II.  MOTION FOR SUMMARY JUDGMENT ...................................14

ARGUMENT ...................................................................................14

   I. THE DISTRICT COURT PROPERLY DISMISSED THE FOURTH
      AMENDED COMPLAINT AGAINST RAND AND GERVAIS ....................14

      A.   This Court should reject Cohen's arguments based on facts neither pled in
         nor inferable from the FAC. ......................................................15

      B.  Cohen failed to state a due process claim against Gervais and Rand. .......16

        ii.   Cohen failed to plead conscience-shocking conduct by
            Rand or Gervais .............................................................23

        iii.  Cohen waived any argument regarding Rand's supervisory role. .........26

      C.  Alternatively, Rand and Gervais are entitled to qualified immunity. ........27

   II.  THE DISTRICT COURT PROPERLY GRANTED SUMMARY
   JUDGMENT TO GIROUX ....................................................................32

      A.The summary judgment record is devoid of any triable issue of fact as to
        causation. ..................................................................................32

      B.  Giroux's conduct was not conscience-shocking as a matter of law. .........38

      C.  Alternatively, Giroux is entitled to Qualified immunity............................40

III.  THE DISTRICT COURT PROPERLY GRANTED SUMMARY
      JUDGMENT TO THE CITY ....................................................................42

   A. There is no evidence of a pattern of prior similar constitutional
      violations..........................................................................................43

   B.   Cohen cannot fit within the single-incident liability theory. ....................46

   C. Cohen cannot establish a direct causal link between the City's alleged
      deficiency in training and the ultimate harm. ................................49

CONCLUSION ................................................................................................51

CERTIFICATE OF COMPLIANCE........................................................................52

CERTIFICATE OF SERVICE .............................................................................53

## TABLE OF AUTHORITIES

**Cases**

*Ablordeppey v. Walsh*, 85 F.4th 27 (2023) ............................................ 17, 29, 41, 42

*Addy v. Jenkins*, 2009 ME 46, 969 A.2d 935 ..........................................................33

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................16

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397 (1997) ..... 46, 47

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).......................................................14

*Bradberry v. Pinellas Cty.*, 789 F.2d 1513 (11th Cir. 1986) ............................. 21, 28

*Brown v. Commonwealth of Pa., Dep't of Health Emergency Med.
   Servs. Training Inst.*, 318 F.3d 473 (3d Cir. 2003) .................................. 21, 28, 42

*Callahan v. North Carolina*, 18 F.4th  (4th Cir. 2021).......................................... 20, 22

*Calvi v. Knox Cnty.*, 470 F.3d 422 (1st Cir. 2006) ........................................... 45, 49

*Canton* v. Harris, 489 U.S. 378 (1989). ........................................................... *passim*

*Cnty. of Sacramento v. Lewis*, 523 U.S. 833 (1998) ......................................... 24, 25

*Collins v. City of Harker Heights, Tex.*, 503 U.S. 115 (1992) ......................... 43, 49

*Connick v. Thompson*, 563 U.S. 51 (2011) .......................................... 44, 45, 46, 47

*D.C. v. Wesby*, 583 U.S. 48 (2018)..........................................................31

*Daggett v. York Cnty.*,
    No. 2:18-cv-00303, 2021 WL 868713 (D. Me. March 8, 2021) ........................36

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
    489 U.S. 189 (1989) .............................................................. 17, 22, 35

*Doran v. Mass. Tpk. Auth.*, 348 F. 3d 315 (1st Cir. 2003) .....................................13

*Est. of Smith v. Salvesen*, 2016 ME 100, 143 A.3d 780 ..........................................33

*Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263 (1st Cir. 2022)................................14

*Garcia-Gonzalez v. Puig-Morales*, 761 F.3d 81 (1st Cir. 2014) ............................33

*Gray v. Cummings*, 917 F.3d 1 (1st Cir. 2019) ................................................. 46, 48

*Gutierrez-Rodriguez v. Cartegena*, 882 F.2d 553 (1st Cir. 1989)..........................32

*Hart v. City of Little Rock*, 432 F.3d 801 (8th Cir. 2005)........................................35

*Hasenfus v. LaJeunesse*, 175 F.3d 68 (1st Cir. 1999) ....................................... 30, 41

*Hope v. Pelzer*, 536 U.S. 730 (2002) ........................................................27

*Irish v. Fowler*, 979 F.3d 65 (1st Cir. 2020).......................................*passim*

*Irish v. Maine*, 849 F.3d 521 (1st Cir. 2017) ................................................ 22, 23

*J.R. v. Gloria*, 593 F.3d 73 (1st Cir. 2010) ................................................. 38, 39, 40

*Johnson v. City of Biddeford*, 665 F.Supp.3d 82 (D. Me. 2023)..............................36

*Johnson v. City of Biddeford*, 92 F.4th 367 (1st Cir. 2024)............................*passim*

*Justiniano v. Walker*, 986 F.3d 11 (1st Cir. 2021) ....................................27

*Kaucher v. County of Bucks*, 455 F.3d 418 (3d Cir. 2006) ......................................34

*Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006) .......................... 18, 19

*L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235 (3d Cir. 2016) ..............................19

*Lopez-Hernandez v. Terumo Puerto Rico LLC*, 64 F.4th 22 (1st Cir. 2023)............49

*Maldondo v. Fontanes,* 568 F.3d 263 (1st Cir. 2009) ..............................................27

*Marrero-Rodríguez v. Municipality of San Juan*, 677 F.3d 497 (1st Cir. 2012)......24

*McCloskey v. Mueller*, 446 F.3d 262 (1st Cir. 2006) ................................. 14, 23, 27

*Meléndez-García v. Sánchez*, 629 F.3d 25 (1st Cir. 2010).....................................30

*Mullenix v. Luna*, 577 U.S. 7 (2015).......................................................................41

*Murguia v. Langdon*, 61 F.4th 1096 (9th Cir. 2023) ...............................................34

*Pearson v. Callahan*, 555 U.S. 223 (2009)..............................................................27

*Penate v. Hanchett*, 944 F.3d 358 (1st Cir. 2019)...................................................26

*Pina v. Children's Place*, 740 F.3d 785 (1st Cir. 2014)..........................................36

*Pittsley v. Warish*, 927 F.2d 3 (1st Cir. 1991).........................................................39

*Rivera v. Rhode Island*, 402 F.3d 27 (1st Cir. 2005)...................................... *passim*

*Rodriquez-Cirilo v. Garcia*, 115 F.3d 50 (1st Cir. 1997) ........................................33

*Salazar v. City of Chicago*, 940 F.2d 233 (7th Cir. 1991).......................................28

*Santiago v. Fenton*, 891 F.2d 373 (1st Cir. 1989) ...................................................50

*Schatz v. Republican State Leadership Comm.*, 669 F.3d 50 (1st Cir. 2012) ...........14

*S.E.C. v. Tambone*, 597 F.3d 436 (1st Cir. 2010) ....................................................16

*Soto v. Flores*, 103 F.3d 1056 (1st Cir. 1997) .................................................. 19, 38

*Souza v. Pina*, 53 F.3d 423 (1st Cir. 1995).......................................... 35, 38, 39, 41

*Vargas-Colon v. Fundacion Damas, Inc.*, 864 F.3d 14 (1st Cir. 2017)....................14

*Welch v. City of Biddeford Police Dep't*, 12 F.4th 70 (1st Cir. 2021) .............. *passim*

*White v. Pauly*, 137 S. Ct. 548 (2017).....................................................................31

*Wilson v. Gregory*, 3 F.4th 844 (6th Cir. 2021) ......................................................19

*Ye v. United States*, 484 F.3d 634 (3d Cir. 2007) ....................................................34

*Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4 (1st Cir. 2005) ............48

**Rules**

Fed. R. Civ. P. 56(c)(1)...................................................................... 49, 50

Me. L.R. 56 ....................................................................................................51

# INTRODUCTION

Appellant John Cohen, as personal representative of Eric Cohen, asks this Court to hold that the City of Portland, a firefighter, and individual law enforcement officers had the exceptional obligation under the Due Process Clause of the United States Constitution to provide successful affirmative aid to an individual, suffering from a mental health crisis, who went into the cold, April waters of the Back Cove in Portland, Maine after having violently assaulted his girlfriend and a bystander. Eric Cohen's death was tragic, and his loss of life has never been in dispute; however, this Court's state-created danger jurisprudence imposes no such exceptional obligation. Nor does the record support the conclusion that the officers created or enhanced the danger to Cohen or that Giroux caused Cohen's death, which was indisputably from hypothermia and drowning. This Court should therefore affirm the District Court's dismissal of Cohen's federal due process claims against Sergeants Rand and Gervais, and it should likewise affirm summary judgment for Giroux and the City.

# STATEMENT OF THE ISSUES

1.      Whether the District Court correctly dismissed the substantive due process state-created danger claims against Christopher Gervais and Micheal Rand.

2.      Whether the District Court correctly found that Ronald Giroux was entitled to summary judgment on the state-created danger claim.

3.      Whether the District Court correctly concluded that the City of Portland was entitled to summary judgment on the failure to train claim.

## STATEMENT OF THE CASE

### I.      PROCEDURAL HISTORY

On September 15, 2021, Plaintiff, John Cohen, as the Personal Representative of his deceased son, Eric Cohen, filed his Complaint in the U.S. District Court for the District of Maine against Defendants City of Portland, John Doe, Christopher Gervais, and Michael Rand. App. 3. On December 20, 2021, Defendants filed a Motion to Dismiss ("MTD") for failure to state a claim. App. 5. In response, Cohen filed a Third Amended Complaint ("TAC"). App. 5. Defendants withdrew their original MTD and filed a MTD the TAC. App. 5. Cohen filed an Opposition, attaching Rand's body camera video and two Portland Police Department Standard Operating Procedures ("SOPs"). App. 5. On April 27, 2022, the District Court granted Cohen's oral motion to file a Fourth Amended Complaint ("FAC") to reference the Rand video and SOPs to allow the court to consider those exhibits in evaluating the MTD. Add. 2-3, nn. 1-2. The parties agreed to treat the Defendants' MTD Cohen's TAC as a motion to dismiss Cohen's FAC. Add. 2, n. 1.

On May 5, 2022, the District Court issued its Order on Defendants' Motion to Dismiss (the "MTD Order"), granting it in part and denying it in part. Add. 2. The MTD Order dismissed all claims against Defendants Gervais and Rand. The District

Court denied the MTD as to the Due Process claim against the City (Count I) and the claims (Counts X, XII, and XIII) against Giroux.[1] Add. 26.

On May 5, 2023, Defendants City and Giroux filed motions for summary judgment. App. 10. On November 27, 2023, the District Court issued a combined Order on Defendants' Motions for Summary Judgment (the "MSJ Order"), granting the motions in their entirety. Add. 59. On that same day, the court entered judgment in favor of Defendants and against Cohen. Add. 60. Cohen filed a Notice of Appeal on November 30, 2023. App. 13. Cohen appeals the MTD Order only as to the federal state-created danger due process claims against Gervais and Rand. Cohen appeals the MSJ Order granting summary judgment to the City and Giroux only as to his federal state-created danger due process claims.

## II.     STATEMENT OF FACTS

### A. Motion to Dismiss Facts[2]

The District Court found the following facts from the FAC – and from the Rand video and SOPs, which were attached to Plaintiff's Opposition and later referenced in the FAC.

---

[1] The original complaint named a John Doe Defendant. Giroux was named, unnamed, and then renamed as a defendant in a series of amended complaints. *See* App. 7-8.

[2] Only the Fifth Amended Complaint is included in the Appendix. App. 15. The Motion to Dismiss considered the Fourth Amended Complaint ("FAC"). Add. 2. The only difference is that Giroux is named in the FAC, otherwise, the allegations and paragraph cites are identical.

On April 12, 2020, shortly after 1:00 p.m., Portland Police received a 911 call reporting that a male subject, Eric Cohen, appeared to be experiencing a mental health crisis, had just assaulted his girlfriend, was naked, and fled toward Interstate 295. FAC ¶ 11. When police arrived at approximately 1:23 p.m., they chased Cohen into the frigid, shallow waters of the Back Cove. Add. 3. The air temperature at that time was around forty-three degrees, and the water temperature was around forty-one degrees. FAC ¶ 14.

At 1:23 p.m., Gervais requested a boat, the Marine 3, from the Portland Fire Department for a water retrieval, and then he and two other officers drove from the Back Cove to the Maine State Pier, where Marine 3 was docked, which took them approximately eleven minutes. FAC ¶¶ 16-18.

At 1:33 p.m., Rand arrived at the Back Cove and spoke with Officer Cunningham, a former U.S. Coast Guard swimmer, who was standing on the shore. FAC ¶¶ 19, 20, 33. Cuningham told Rand: "The problem is, this guy has about fifteen minutes to live. If he begins to struggle, I will strip . . . , [and] go in and cover him." FAC ¶ 20. Rand responded: "We should have the fire boat right off, but I understand what you gotta do." *Id.*

By 1:39 p.m., approximately nine police officers and fire-rescue personnel lined the shore. FAC ¶¶ 22-24. At that point, Cohen was thirty feet offshore and in waist-deep water. FAC ¶ 22. Rand said to Cunningham: "I don't want you going out

4

there [and] fighting with him." Cunningham responded: "I have watched a lot of people drown and it's not long now." Add. 4. Rand replied: "Oh, I know," and then after a pause continued, "If they have a life jacket or anything of that sort that you can put on, I'd be okay with it, but I don't want you going out there without it." *Id.* As other first responders arrived on scene, Rand asked if anyone had a life jacket available. *Id.*

At 1:42 p.m., Cunningham reported that Cohen had gone under water. FAC ¶ 29. At 1:45 p.m., Cunningham again offered to go rescue Cohen, stating: "If you give me a life jacket, I'll go save this guy's life." FAC ¶ 33. Rand agreed, but just as Cunningham began removing his tactical vest, Marine 3 reported that it was about 100 feet from Cohen. FAC ¶¶ 33-34. Rand told Cunningham not to enter the water because Marine 3 was nearing Cohen. FAC ¶ 35.

At 1:46 p.m., twenty-three minutes after Cohen entered the water, Rand asked whether an ambulance was en route. FAC ¶ 36. None had yet been assigned, and so an ambulance was summoned. FAC ¶ 37. At 1:47 p.m., Gervais (on board Marine 3) reported that the boat had retrieved Cohen's body and that he was unable to find a pulse. FAC ¶¶ 38-39. At 1:49 p.m., Cohen was brought to shore and lay naked for approximately two minutes before a firefighter removed his jacket and covered him. Add. 5. Life-saving measures were commenced four minutes after Cohen was removed from the water. FAC ¶ 45. At 1:53 p.m., the ambulance arrived and

emergency personnel administered CPR and other resuscitating measures. *Id.* Cohen was later pronounced dead at Maine Medical Center. FAC ¶ 47. The Medical Examiner ruled the causes of Cohen's death were drowning and hypothermia. FAC ¶ 48.

## B. Motions for Summary Judgment Facts

The undisputed material facts demonstrate the following. On April 12, 2020, at approximately 1:16 p.m., City of Portland Police Department ("PPD") officers were dispatched near the Miss Portland Diner on Marginal Way to respond to an assault in progress. App. 136-37, ¶¶ 10-11. Upon arrival, officers spoke with a woman and learned that her boyfriend, Eric Cohen, had just violently assaulted her; the officers observed that she was bleeding from her nose and mouth and that both eyes were becoming blackened and swollen. App. 137, ¶¶ 11-12; App. 152. The officers informed dispatch that MEDCU (an ambulance) was needed at the scene, and the Portland Regional Communications Center (PRCC) dispatched MEDCU 5 to the area of the Miss Portland Diner. App. 137, ¶¶ 13, 16. Officers spoke with a bystander, also exhibiting injuries; the bystander said he had tried to stop Cohen from beating up the woman. App. 137-38, ¶¶ 17-18. When the bystander tried to intervene, Cohen punched him and kicked him in the head. *Id.*; App. 153. A second witness told an officer that he thought the woman may have died if the bystander had not intervened. App. 138, ¶ 19.

An officer advised police dispatch that the male suspect, who may be having a "mental break," was naked and running on the interstate, and requested that PPD units access the interstate to try to locate the suspect. App. 138, ¶ 21. The officers further advised dispatch that the incident was a domestic violence assault/aggravated assault, and dispatch broadcasted that information over the radio to PPD officers. App. 139, ¶ 24.

At approximately 1:22 p.m., Officers IL and another officer reported to police dispatch that they could see Cohen from the off-ramp of I-295 on Franklin Arterial on the shore side. App. 139, ¶ 28. Officer IL exited his cruiser, jumped over the fence separating the off-ramp and the walking path, and attempted to make contact with Cohen, who was approximately 300 feet away from him. App. 139, ¶ 28. Cohen ran closer toward the shore. *Id.* Meanwhile, around that same time, MEDCU 5 and Engine 5 (Portland Fire Department truck) arrived at the scene near the Miss Portland Diner and started attending to the woman and bystander's injuries. App. 139, ¶ 29.

The Back Cove is a body of water in Portland, Maine with a walking trail around its perimeter, portions of which abut Interstate 295 or the area adjacent to Interstate 295. App. 100, ¶ 52; App. 149-151. At approximately 1:23 p.m., Cohen ran into the waters of Back Cove and started swimming away from the shore. App.

139-40, ¶ 30; App. 212-214; App. 220 at 00:17-55. At the time Cohen entered the water, Officer IL was approximately 150 feet away from Cohen. App. 139, ¶ 30.

Around this time, Gervais was driving in his cruiser on the off-ramp and observed Cohen in the water swimming away from the shore. App. 140, ¶ 25. Gervais asked PRCC to notify the Portland Fire Department ("PFD") to ready its marine unit for an attempted water retrieval. *Id.* ¶ 36. The PFD marine unit has three boats. App. 141, ¶ 39. Marine 3 is the only unit with a flat bottom, but its capacity does not allow for advanced medical equipment on board. *Id.* The PFD personnel in charge of the Marine unit decided that Marine 3 was the only boat capable of entering the area where Cohen was located. *Id.* ¶¶ 39-40. Meanwhile, at approximately 1:30 p.m., Officer Cunningham arrived on the scene and his supervisor, Rand, arrived shortly thereafter. *Id.* ¶ 41.

At approximately 1:34 p.m., Ladder 6 (a large ladder truck) and Rescue 1 (a large fire truck) of the PFD were dispatched to assist PPD; both units drove towards and parked in the Back Cove Trail Parking lot. App. 142, ¶ 45. Upon arrival at that area, PFD saw that PPD officers were on the other side of the Back Cove, closer to the Franklin Arterial off ramp. *Id.* ¶ 46. Because both Ladder 6 and Rescue 1 were too large to drive down the walking trail to get closer to the shoreline and because it was unclear where the marine unit would beach, Rescue 1, driven by Firefighter

Giroux, drove towards the Franklin Street arterial off ramp, and Ladder 6 remained in the Back Cove Trail parking area. *Id.*; App. 147, ¶¶ 6, 7.

Not knowing exactly what was transpiring, Giroux drove as close as he could get to the area of the Back Cove (where he saw the PPD officers were located) by driving against traffic on the I-295 off-ramp of the Franklin Street exit and parked on the off-ramp at approximately 1:42 p.m. *Id.* ¶¶ 8-9. Approximately 70 seconds later, after Giroux had just opened the driver-side door, he said to the PPD officers: "Tell him we're gonna kick his ass if he gets out of that water." Add. 32.[3]

After Giroux exited the firetruck, he began readying to saw a hole in the tall, metal fence that separated Rescue 1 from the shoreline area so that he would be able to deploy rescue equipment through the fence. App. 73-74, ¶¶ 7, 11. Approximately two minutes and forty seconds after Rescue 1's arrival to the off-ramp, Giroux tossed a life jacket over the tall, black fence to another firefighter. App.74, ¶ 12. From where Giroux always stood behind that fence, he could see an individual in the water, who he knew only to be a suspect involved in a domestic assault. App. 146, ¶¶ 1-2; App. 75, ¶¶ 14, 16-17. The individual appeared to Giroux to be swimming or standing, and Giroux could see what he knew to be Marine 3 approaching the individual's location in the water. App. 75, ¶¶ 13, 16. As described below, personnel

---

[3] The District Court found that a reasonable juror could find that Giroux made this statement, which Defendants accept for purposes of this appeal.

on the fireboat pulled Cohen from the water at approximately 1:46 p.m.—just four minutes after Rescue 1 arrived to the off-ramp. App. 146-47, ¶¶ 9, 14.

At approximately 1:42 p.m., Rand told Cunningham that if he could get a lifejacket, he would be okay with Cunningham going into the water.[4] App. 142, ¶ 48. At approximately 1:44:13 p.m., Cunningham advised Gervais that Cohen was starting to go under water. App. 143, ¶ 53. Gervais asked Cunningham if the officers on shore could see the boat and Cunningham answered yes. *Id.* At approximately 1:44:50 p.m., Cunningham got a lifejacket from the firefighters and started to take off his gear to enter the water, but as he was doing this, the fireboat approached Cohen. *Id.* ¶¶ 54-55.

At approximately 1:46 p.m., the fireboat reached Cohen, and Gervais and the others on the boat were able to pull Cohen from the water and into the boat. App. 144, ¶ 60. At approximately 1:47 p.m., Gervais confirmed to dispatch that they had Cohen on board and would be landing the boat on shore. *Id.* ¶ 61. Approximately one minute later, the boat beached, and PPD officers waded into the water to meet the boat and carry Cohen to shore, where Cohen was placed on his side in a recovery position as an Advanced EMT firefighter from Rescue 1 immediately attended to him. *Id.* ¶ 62.

---

[4] Rand was concerned that Cohen would be assaultive towards Cunningham in the water, and Rand would have no ability to provide support should Cunningham enter the water and get into a physical confrontation with Cohen. App. 63, ¶ 58.

Approximately 50 seconds later, a Paramedic disembarked from the fireboat to assist. *Id.* ¶ 63. The Paramedic assessed Cohen and, approximately 45 seconds later, he took off his winter jacket and placed it on Cohen. *Id.* Approximately 30 seconds later, the crew from Engine 5 (a Paramedic, Advanced EMT, and Basic EMT) arrived on scene with a blanket and medical equipment and started administering first aid to Cohen. *Id.* ¶ 64. At 1:50 p.m., MEDCU 1 arrived on scene and, by 1:51 p.m., the personnel from MEDCU 1 also began administrating care to Cohen. *Id.* ¶ 65. Cohen was transported to Maine Medical Center and given emergency care, but he was pronounced deceased at 2:52 p.m. *Id.* ¶ 66. His cause of death was hypothermia and drowning. App. 148, ¶ 17.

## SUMMARY OF THE ARGUMENT

The District Court properly dismissed the substantive due process state-created danger claims against Rand and Gervais and correctly held on summary judgment that Cohen had failed to create a triable issue as to the state-created danger claim against Giroux and as to the municipal liability claim against the City of Portland.

First, dismissal was proper because Cohen failed to allege affirmative acts by Rand or Gervais that created or enhanced the danger to Cohen and failed to allege conscience-shocking conduct. Cohen's attempts to add new facts in his brief or rely on facts that are only in the summary judgment record should be rejected. Cohen's

characterization of Gervais and Rand's conduct as affirmative acts is a poorly disguised attempt to transform nonaction into an affirmative act. Gervais's alleged failure to rescue Cohen more quickly by boat and Rand's alleged failures to personally enter the cold water to attempt a rescue or use unidentified crisis intervention techniques does not state affirmative action, nor does it meet the incredibly high standard for conscience-shocking conduct.

Alternatively, the law was not clearly established such that Rand or Gervais would have been on notice that their conduct amounted to a violation of Cohen's constitutional rights. This Court's state-created danger precedent is largely in an entirely different context involving violence to victims by third-party actors; not rescue attempts of a domestic assault suspect where the harm is cold water. The dismissal should therefore be affirmed.

Second, Giroux was entitled to summary judgment because Cohen did not create a triable issue as to causation, which is necessary for a state-created danger claim. Cohen failed to demonstrate that the single comment made by Giroux, after Cohen had already been in the water for approximately twenty minutes, caused Cohen to die from drowning and hypothermia. Cohen relies on mere speculation to establish causation, which the District Court properly rejected. Nor can Giroux's single comment rise to the incredibly high standard for conscience-shocking conduct under this Court's precedent. Alternatively, Giroux is similarly entitled to qualified

immunity because he would not have been on notice that his single comment made during a stressful rescue scenario would amount to a state-created danger claim.

Finally, the District Court correctly granted summary judgment for the City of Portland as to the failure to train municipal liability claim because Cohen did not generate a dispute of fact as to the City's deliberate indifference or causation. Cohen failed to introduce any evidence of a pattern of prior similar constitutional violations, and his attempts to fit within the single-incident theory to establish deliberate indifference should be rejected. Cohen relies only on the videos of this incident and training records of the two dismissed officers to assert a more or better training argument that has consistently been rejected. The record indisputably demonstrates the extensive training provided to Portland officers. Cohen also failed to demonstrate a direct causal link between the City's alleged deficient training and the ultimate harm to Cohen. Again, he relies on nothing more than the fact that this incident occurred, which does not satisfy the standard for establishing municipal liability. Accordingly, the District Court's MSJ Orders were correct, and the judgment in favor of Defendants should be affirmed.

## STANDARD OF REVIEW

### I.       MOTION TO DISMISS

Cohen incorrectly recites the pre-*Twombly* "any set of facts" pleading standard. Blue Br. 11 (citing *Doran v. Mass. Tpk. Auth.*, 348 F.3d 315, 318 (1st Cir.

2003)). Instead, "to survive a motion to dismiss, a complaint's factual allegations must be 'enough to raise a right to relief above the speculative level.'" *Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 269–70 (1st Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see* S*chatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012) (explaining the two-step process for assessing the sufficiency of a complaint).

This Court reviews de novo a district court's dismissal of a suit for failure to state a claim, *Frith*, 38 F.4th at 269, and it can affirm an order of dismissal on any ground apparent in the record, *McCloskey v. Mueller*, 446 F.3d 262, 266 (1st Cir. 2006).

## II.     MOTION FOR SUMMARY JUDGMENT

Defendants agree with the summary judgment standard set forth in Cohen's opening brief but add that this Court can affirm summary judgment on any ground apparent from the summary judgment record, *see, e.g., Vargas-Colon v. Fundacion Damas, Inc.*, 864 F.3d 14, 22 (1st Cir. 2017).

## ARGUMENT

## I.     THE DISTRICT COURT PROPERLY DISMISSED THE FOURTH AMENDED COMPLAINT AGAINST RAND AND GERVAIS

Cohen appeals the District Court's MTD Order only as to his substantive due process state-created danger claims against Gervais (Count II) and Rand (Count VI). Blue Br. 12-17.

### A. This Court should reject Cohen's arguments based on facts neither pled in nor inferable from the FAC.

On appeal, Cohen erroneously relies on allegations that were never asserted in the FAC, nor can they be reasonably inferred from either the FAC, the Rand body camera video, or the SOPs. Cohen repeatedly cites to the Gervais body camera video to argue that he sufficiently alleged conscience-shocking conduct, Blue Br. 12-13; however, Cohen cannot rely on these "facts," which were neither alleged in the FAC nor before the District Court. The only video referenced in the FAC and considered by the court at the motion to dismiss stage was the Rand body camera video. FAC ¶ 49. Cohen did not submit the Gervais video until he opposed the motions for summary judgment. *See* App. 11 (Gervais Body Camera filed on June 13, 2023; District Court ECF Doc. No. 109-1).

This Court should likewise reject Cohen's attempt to add new "facts" in his brief related to Rand's alleged failure to follow the mental health crisis protocol. Cohen attached the Crisis Intervention SOP to his FAC, which was considered by the District Court. However, the FAC only includes one vague, conclusory allegation related to that SOP in the Eighth Amendment claim against Rand (Count VII), which is not on appeal. FAC ¶ 90. Otherwise, the FAC merely alleges that "[t]he policies

and procedures of the Portland Police Department regarding Mental Health Crisis Intervention . . . have also been provided as Exhibits in this matter." FAC ¶ 50. The motion to dismiss standard is generous and permits drawing reasonable inferences, "but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *see also S.E.C. v. Tambone*, 597 F.3d 436, 422 (1st Cir. 2010) (en banc) (holding the motion to dismiss standard does not require the court to accept "factual allegations in the complaint [that] are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture").

Cohen also advances an argument that dismissal was improper based on facts that "were more fully established after the dismissal of the individual officers." Blue Br. 16-17. This argument is procedurally erroneous; Cohen cannot rely on "facts" that were developed later in the case to rescue the claims previously dismissed against Gervais and Rand under Rule 12(b)(6). His attempts to rely on new facts in his appeal as to Rand and Gervais should be rejected.

## B. Cohen failed to state a due process claim against Gervais and Rand.

The Due Process Clause "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. . . [I]ts language cannot fairly be extended to impose an affirmative obligation on the State to ensure that [its guarantees of life, liberty, and property] do not come to harm through other

means." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). It therefore confers "no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests." *Id.* at 196. In *DeShaney*, the Court alluded to a limited exception to this general rule, recognizing that an affirmative duty to protect could arise in limited circumstances, "not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* at 200.

The state-created danger doctrine was "conceived of as an exception to the general rule that a state's failure to prevent harm by a private actor does not constitute a constitutional violation." *Ablordeppey v. Walsh*, 85 F.4th 27, 33 (2023). In *Irish II*, this Court formally recognized the viability of a state-created danger claim and explained that the plaintiff must show:

> (1) that a state actor or state actors affirmatively acted to create or enhance a danger to the plaintiff;
> (2) that the act or acts created or enhanced a danger specific to the plaintiff and distinct from the danger to the general public;
> (3) that the act or acts caused the plaintiff's harm; and
> (4) that the state actor's conduct, when viewed in total, shocks the conscience.

*Irish v. Fowler*, 979 F.3d 65, 75 (1st Cir. 2020) ("*Irish II*").

Although Cohen attempts in his opening brief to conjure facts that will establish these elements, the District Court properly dismissed the FAC against Rand

and Gervais because it failed to allege (i) affirmative acts and (ii) conscience shocking conduct. Moreover, the court properly assessed the conduct of Rand and Gervais separately. *See Welch v. City of Biddeford Police Dep't*, 12 F.4th 70, 75-76 (1st Cir. 2021) (explaining that each officer's acts must, on their own, give rise to a state-created danger claim).

> i. <u>Cohen failed to plead any affirmative act by Rand or Gervais.</u>

As to Gervais, the court properly determined that the length of time he took to reach the rescue boat and his alleged failure to provide first aid to Cohen were insufficient to allege any affirmative act on the part of Gervais that created or enhanced a danger to Cohen. Add. 15. As to Rand, Cohen's allegations that he did not attempt to personally rescue Cohen or coax him out of the water also did not rise to the level of affirmative acts. Add. 15-16. The court also rejected Cohen's argument that the "single instance in which Rand prohibited Cunningham from entering the water enhanced the danger to Cohen." Add. 15-16.

The state-created danger exception is applicable only when the affirmative act "actually . . . created or escalated the danger to the plaintiff." *Irish II*, 979 F.3d at 74 (alterations omitted). An affirmative act enhances danger to an individual when it places that individual "in danger that [he] otherwise would not have faced." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062 (9th Cir. 2006); *see also Irish II*,

979 F.3d at 73–74 (citing *Kennedy* for support that courts "uniformly require that the defendant affirmatively acted to create or exacerbate a danger").

This Court's state-created danger precedents indicate that inaction does not constitute an affirmative act. *See Johnson v. City of Biddeford*, 92 F.4th 367, 378 (1st Cir. 2024) (rejecting argument that officer's failures to inquire if suspect had access to a firearm, initiate a mental health intervention, or arrest the suspect amounted to affirmative action); *Rivera v. Rhode Island*, 402 F.3d 27, 36 (1st Cir. 2005) ("[I]n a state creation of risk situation, where the ultimate harm is caused by a third party, 'courts must be careful to distinguish . . . between state inaction and action.'" (quoting *Soto v. Flores*, 103 F.3d 1056, 1064 (1st Cir. 1997))); *see also Wilson v. Gregory*, 3 F.4th 844, 858 (6th Cir. 2021) ("failure to act is not an affirmative act under the state-created danger theory") (quotation omitted).

And even where some courts consider inaction to be a potential affirmative act, they still require that inaction meaningfully change the status quo such that there is some kind of nexus between the affirmative act and the creation or enhancement of the danger. *See L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 243 (3d Cir. 2016) ("Rather than approach this inquiry as a choice between an act and an omission, we find it useful to first evaluate the setting or the 'status quo' of the environment before the alleged act or omission occurred, and then to ask whether the state actor's exercise of authority resulted in a departure from that status quo."); *see also*

*Callahan v. N.C. Dep't of Pub. Safety*, 18 F.4th 142, 147 (4th Cir. 2021) ("[C]ontinued exposure to an existing danger by failing to intervene is not the equivalent of creating or increasing the risk of that danger.").

The district court properly held that Cohen's allegations of inaction by Gervais and Rand failed to plead an affirmative act by either one of them. As to Gervais, the FAC alleged that Gervais requested a rescue boat from the PFD and that it took eleven minutes for him to drive from the Back Cove to the location where Marine 3 was docked. FAC ¶¶ 16-18. At 1:47 p.m., Gervais (on board Marine 3) reported that Cohen's body was on board and that Marine 3 would be landing on the beach. FAC ¶ 38. The FAC further alleged that, at that point in time, Cohen had been face down in the water for four to five minutes, in the frigid water for twenty-four minutes, and that Gervais was unable to find Cohen's pulse. FAC ¶ 39; Add. 5. Consistent with this Court's precedent, these allegations did not sufficiently state affirmative acts on the part of Gervais that created or enhanced a danger to Cohen.

Specifically, and contrary to Cohen's argument, Blue Br. 12, it cannot be inferred reasonably from the FAC that Gervais's decision to request and meet the boat created or enhanced a danger to Cohen. To the contrary, he was attempting to rescue Cohen from the water, and the mere fact that the rescue was ultimately unsuccessful does not convert his conduct into danger enhancing acts. Moreover, by the time Gervais requested the boat, Cohen was already in the cold waters of the

Back Cove. Courts have held that there exists no constitutional duty to rescue an individual who is already in danger. *See*, *e.g.*, *Bradberry v. Pinellas Cnty.*, 789 F.2d 1513, 1517–18 (11th Cir. 1986) ("[W]e do not believe that due process is implicated when the state fails to help someone already in danger."). Courts have also held that, once a rescue has commenced, there is no constitutional duty to carry out the rescue successfully. *See*, *e.g.*, *Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 478 (3d Cir. 2003) (holding that the due process clause does not "place an affirmative obligation on the State to provide competent rescue services if it chooses to provide them").

Even considering Cohen's new allegations in his brief, Blue Br. 13, that Gervais intentionally chose not to administer first aid, this describes a failure to act, not affirmative action. Inaction or an omission does not satisfy the affirmative act requirement, *see Johnson*, 92 F.4th at 378; and, even if it does, Cohen nevertheless did not plead any facts showing that Gervais's conduct meaningfully altered the status quo. The FAC does not plausibly allege that Gervais played any part in the creation or enhancement of the danger Cohen faced by remaining in the cold water, and dismissal should therefore be affirmed.

As to Rand, Cohen argues that Rand intentionally chose not to try to personally rescue Cohen, did not order or allow any officer to do so, chose "not to utilize any crisis intervention techniques," and failed to request a MEDCU. Blue Br.

14-15. As with Gervais, these allegations fail to state an affirmative act that created or enhanced the danger to Cohen. Cohen's rephrasing of the allegations in his FAC to assert that Rand made a "choice" and his addition of an adjective like "intentional" do not transform an alleged omission or failure to act into an affirmative act for purposes of a state-created danger claim. *See Callahan*, 18 F.4th at 148 ("The question is not how [plaintiff] characterizes the allegations. It is not enough to reframe a failure to protect against a danger into an affirmative act.").

Cohen's Brief even later acknowledges that the conduct alleged against Rand is based on alleged failures to act, Blue Br. 16, which cannot be the basis for a state-created danger claim, and finding otherwise is contrary to the core holding of *DeShaney*, see 489 U.S. at 195–97. In fact, Cohen describes failures by Rand that are indistinguishable from those described in *Johnson*, which were deemed not to be affirmative acts. *See Johnson*, 92 F.4th at 378.

Cohen claims that this Court's decision in *Irish I*, *see Irish v. Maine*, 849 F.3d, 521, 528 (1st Cir. 2017) ("*Irish I*"), should allow him to survive a motion to dismiss as to Gervais or Rand because this Court held that the failure to follow police protocol may be sufficient to establish a due process claim, Blue Br. at 12, 14. However, that conclusion in *Irish I* does nothing to rescue Cohen's due process claims as to Gervais and Rand. 849 F.3d at 528. Unlike here, the plaintiffs in *Irish I* had alleged multiple affirmative acts by officers that created a danger to them,

including leaving a voicemail message for Ms. Irish's perpetrator that informed him of her rape allegation despite her expressed concerns for her safety and objections to the officers. *Id*. at 526. Moreover, the officers relied in their argument on the fact that contacting and interviewing a suspect is standard police procedure, *id.*, and this Court remanded the case for further development of whether there were standard protocols or training that were violated by the affirmative acts alleged in the complaint, which, unlike here, plausibly could have created or increased the very danger to the *Irish I* plaintiffs that was ultimately realized, *id.* at 527–28.

In contrast to the complaint in *Irish I*, Cohen has not identified, beyond conclusory statements, any affirmative conduct relating to the SOPs that created or enhanced a danger to Cohen. The FAC bears no resemblance to the affirmative acts set forth in the *Irish I* complaint, and therefore Cohen cannot rely on *Irish I* to survive dismissal of his claims against Rand and Gervais.

  ii. <u>Cohen failed to plead conscience-shocking conduct by Rand or Gervais.</u>

The District Court also correctly found that Gervais's conduct was not conscience-shocking, and Cohen's failure to plead the same as to Rand is an alternative basis to affirm dismissal for Rand, *McCloskey*, 446 F.3d at 266. The requirement that the state actor's conduct shock the conscience has been described as "onerous," requiring action that is "egregious" and "outrageous." *Rivera,* 402 F.3d at 35–36. "[C]onduct *intended* to injure in some way *unjustifiable* by any

government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at 36 (emphasis in original) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 839 (1998)). Conduct amounting to mere negligence is "categorically beneath the threshold of constitutional due process." *Marrero-Rodríguez v. Mun. of San Juan*, 677 F.3d 497, 501 (1st Cir. 2012).

Neither Gervais nor Rand's alleged conduct can be reasonably characterized as extreme or egregious such that it shocks the conscience. The FAC sets out a minute-by-minute account of the underlying events, and unlike the officers in *Irish*, Rand and Gervais had to make real-time decisions "in a matter of . . . minutes" in response to Cohen's unexpected entry into the waters of the Back Cove. *Cf. Irish II*, 979 F.3d at 75. Gervais and Rand's conduct was reactionary in response to an evolving situation that started with Cohen committing a domestic violence assault and fleeing into the frigid water. Gervais made a judgment call to attempt a rescue by boat. Rand had to continue evaluating in real time whether to wait for the boat or send an officer into the frigid waters to try to rescue an individual who had earlier committed an assault. Rand's conversation with Cunningham demonstrates that this was an evolving situation, which Rand was continuing to assess. Add. 16. Thus, "a higher level of culpability" than deliberate indifference is required to meet the shocks-the-conscience standard. *Irish II*, 979 F.3d at 75. The alleged conduct of Gervais and Rand described above was not "intended to injure" Cohen and does not

rise to the conscience-shocking level. *Rivera*, 402 F.3d at 36 (quoting *Lewis*, 523 U.S. at 849).

The Supreme Court has set an incredibly high standard for conduct that shocks the conscience, and Gervais and Rand's unsuccessful rescue falls far short of that standard. *See Lewis*, 523 U.S. at 836–37 (police officer's conduct did *not* shock the conscience where the officer deliberately, recklessly and with "indifference to life" initiated a high-speed chase and ultimately struck and killed a sixteen-year-old passenger). Nor does the conduct of Gervais or Rand alleged in the FAC come close to the conscience-shocking actions taken by the officers in *Irish*, wherein the officers were "deliberately indifferent to the danger they knowingly created" when those officers contacted a suspect in a manner that notified him that the woman he had raped had reported him to the police and they did so despite the victim's explicit and repeated warnings that this would result in violence. *Irish II*, 979 F.3d at 68–69, 79. Here, the FAC alleges that Gervais commissioned a boat to conduct a cold-water rescue and that Rand did not personally attempt to rescue Cohen from land and, at one moment in time, prohibited another officer from entering the frigid water without a lifejacket. Even if such conduct were to constitute affirmative acts, it does not rise to the level of conscience-shocking conduct such that either Rand or Gervais had a constitutional duty to protect Cohen from the cold waters.

Finally, and contrary to Cohen's argument, Blue Br. 17, the fact that the court determined that the FAC allowed an inference of indifference, at the motion to dismiss stage, for purposes of the failure to train claim against the City does not rescue Cohen's failure to plead individual conduct on the part of Rand or Gervais that was conscience-shocking. As the court recognized, each individual officer's acts must, "on their own, [] give rise to a state-created danger claim*." Welch,* 12 F.4th at 75-76. Moreover, state-created danger claims require plausibly alleging all four elements. Cohen's argument equates the element of indifference with a state-created danger claim, making all of the other elements superfluous, which is flatly wrong under *Irish II.*

### iii.  Cohen waived any argument regarding Rand's supervisory role.

Cohen's undeveloped argument that dismissal of Rand was error because he was "in charge of the scene," Blue Br. 14, 16, should be rejected because Cohen never alleged a supervisory claim against Rand, nor did he make this argument before the District Court, *see* Add. 17, n.7. Even so, a state-created danger claim must be based on Rand's own acts, *Welch*, 12 F.4th at 75–76, and alleged negligence in his supervisory duties is insufficient to establish liability under Section 1983, *Penate v. Hanchett*, 944 F.3d 358, 367–68 (1st Cir. 2019) ("Liability cannot rest on a defendant's position of authority alone. . . . Nor is alleging mere negligence by a supervisor enough.").

**C. Alternatively, Rand and Gervais are entitled to qualified immunity.**

The District Court did not reach their qualified immunity arguments; however, this Court may affirm "on any basis made apparent by the record," *McCloskey*, 446 F.3d at 266. "Qualified immunity protects an officer from suit when a reasonable decision in the line of duty ends up being a bad guess—in other words, it shields from liability all but the plainly incompetent or those who knowingly violate the law." *Justiniano v. Walker*, 986 F.3d 11, 26 (1st Cir. 2021) (quotation omitted). The qualified immunity analysis is a two-part test, requiring a court to determine "(1) whether the facts alleged . . . by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Maldondo v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). A right is "clearly established" for purposes of qualified immunity when "the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." *Id.* at 269 (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

As to the first prong, for the reasons discussed, Cohen failed to plausibly allege a state-created danger claim against Gervais or Rand. As to the second prong, the substantive due process right at issue here was not clearly established as of April 2020. There was no Supreme Court or First Circuit precedent or consensus of

controlling or persuasive authority that would have put Gervais or Rand on notice that their particular conduct amounted to a due process violation based on the state-created danger doctrine.

Here, Cohen must show that controlling case law in April 2020 clearly established that Gervais and Rand's response to a suspect who had just committed a domestic violence assault, was having a mental break, and fled into the water was unconstitutional. Cohen cannot make this showing. First, although the First Circuit does not appear to have addressed the question of whether a governmental entity has a constitutional duty to provide effective rescue services, other courts have held that no such duty exists. *See*, *e.g.*, *Brown*, 318 F.3d at 478; *Salazar v. City of Chicago*, 940 F.2d 233, 237 (7th Cir. 1991) ("Government generally has no constitutional duty to provide rescue services to its citizens, and if it does provide such services, it has no constitutional duty to provide competent services to people not in its custody."); *Bradberry*, 789 F.2d at 1517–18 (11th Cir. 1986) ("[W]e do not believe that due process is implicated when the state fails to help someone already in danger. To hold otherwise, we would have to read into the Constitution the tort law principle that a rescue, once begun, must be carried out with due care. We decline to take such an extreme step."). The consensus of cases from other Circuits establishes that there is *not* a substantive due process violation under these facts. *See Irish II*, 979 F.3d at 76–77.

Second, it would not have been clear to every officer in Gervais or Rand's position that their alleged conduct responding to a domestic violence assault call and their subsequent rescue strategy would implicate the state-created danger doctrine under the circumstances they faced. Most of the state-created danger cases in this Circuit involve acts of violence inflicted by a third party. *See Welch,* 12 F.4th at 72 (considering state-created danger claim where officers responded to threats by a landlord and landlord later shot the tenants who had reported the threats); *Irish II*, 979 F.3d at 67; *Rivera,* 402 F.3d at 30 (considering state-created danger claim where a witness was murdered the day before testifying in court and her estate alleged police should have protected her).

Here, the pertinent dangers to Cohen were environmental—the frigid water. This case does not implicate direct police interactions with a suspect of a crime that then created a violent risk to a witness or victim of that crime at the hands of that suspect; rather it involves police decisions as to how to carry out a rescue of a civilian from frigid waters after he committed a domestic violence assault without endangering the lives of rescue personnel. FAC ¶¶ 11, 13. This Court's precedent is "thus worlds apart" from the particular circumstances faced by Gervais and Rand, *Ablordeppey,* 85 F.4th at 34, and this Court's case law did not clearly establish that the failure to successfully rescue Cohen from the cold water amounted to a constitutional violation.

It appears that the most factually analogous First Circuit case is *Hasenfus v. LaJeunesse*, in which parents brought suit against their child's school for failing to prevent the child from attempting suicide on school grounds. 175 F.3d 68, 69–70 (1st Cir. 1999). This Court, like other Circuits, held that a failure to render aid to a person who is already in danger does not give rise to a substantive due process claim. *Id.* at 72 (explaining that the imposition of an affirmative duty to "render aid to a student in peril" would "require pungent facts," including "conduct that is truly outrageous, uncivilized, and intolerable"). Moreover, the plaintiffs in *Hasenfus* relied on a "special relationship" theory, rather than a "state-created danger" theory to show that the school had an affirmative duty to protect. *Id.* at 71. Cohen has never argued a "special relationship" theory of liability and, in any event, the drastically different facts in *Hasenfus* would not have provided Rand or Gervais with the requisite notice.

Furthermore, Gervais and Rand's conduct was reasonable in light of the competing demands they faced. *See Johnson*, 92 F.4th at 378 (officer entitled to qualified immunity, in part, because it was reasonable for officer to believe that transmitting information to tenants would escalate the conflict) (citing *Meléndez-García v. Sánchez*, 629 F.3d 25, 37 (1st Cir. 2010) ("[E]ven where the government is aware of specific dangers . . . it must perform a triage among competing demands.")). Gervais and Rand knew Cohen had assaulted his girlfriend and was in

a state of psychosis; they had to weigh a host of risks associated with conducting a water rescue of an assault suspect. Gervais reasonably could have believed that commissioning a boat to attempt the rescue would not create or enhance the danger to Cohen, but rather was the most effective way to rescue him. Similarly, Rand reasonably could have believed that permitting Cunningham to enter the cold water alone to engage with a suspect who had just committed an assault and was having a mental health crisis was too risky and that the preferable strategy was to wait for the boat. The unusual and complex circumstances of this case further indicate that Gervais and Rand did not violate a clearly established right. *D.C. v. Wesby*, 583 U.S. 48, 67 (2018) ("[T]he fact that a case is unusual, we have held, is an important indication that the officer's conduct did not violate a 'clearly established' right." (quoting *White v. Pauly*, 580 U.S. 73, 80 (2017) (cleaned up))).

Here, no reasonable officer in Gervais's shoes would suspect that commissioning the fireboat for a cold-water rescue—even if the boat was delayed—clearly amounted to danger creating or enhancing affirmative acts and conscience-shocking conduct. Similarly, the law was not clearly established such that every reasonable officer would conclude that Rand's decision to wait another minute for the fireboat to reach Cohen, rather than send an officer alone into the frigid water after a combative suspect, was unconstitutional. Because the FAC does not plausibly allege that Gervais or Rand violated Cohen's clearly established due process rights,

they are entitled to qualified immunity, and this Court should alternatively affirm the dismissal on that basis.

## II. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO GIROUX

Cohen only appeals from the court's MSJ Order as to his federal, substantive due process state-created claim alleged against Giroux. Blue Br. 18-22. However, the District Court properly determined that Giroux is entitled to judgment as a matter of law because the record is devoid of any evidence from which a juror could reasonably conclude that Giroux caused Cohen's death. Add. 48. This Court can alternatively affirm judgment for Giroux because his conduct was not conscience-shocking and he is entitled to qualified immunity.

### A. The summary judgment record is devoid of any triable issue of fact as to causation.

In order to establish a state-created danger claim, Cohen must show that any danger-enhancing affirmative act was the cause of Eric Cohen's death. *Irish II*, 979 F.3d at 75; *see also Rivera*, 402 F.3d at 34. Thus, although the District Court found that the comment did not "create" but could have "enhanced" the danger to Cohen, Add. 44-45, Giroux is still entitled to judgment as a matter of law.

At the summary judgment phase, the causal connection cannot be based on mere conjecture. Because "inquiries into causation under § 1983 are cabined within common law tort principles," *Gutierrez-Rodriguez v. Cartegena*, 882 F.2d 553, 561

(1st Cir. 1989), Cohen must be able to show causation by pointing to evidence in the record that is not "unduly speculative," *Est. of Smith v. Salvesen*, 2016 ME 100, ¶ 21, 143 A.3d 780; *see Addy v. Jenkins*, 2009 ME 46, ¶ 12, 969 A.2d 935 ("The mere possibility of such causation is not enough . . . even if the possibilities are evenly balanced, a defendant is entitled to a judgment.").

Moreover, the causal connection between the affirmative act and the purported constitutional deprivation must bear out both but-for and proximate causation. *See Rodriquez-Cirilo v. Garcia*, 115 F.3d 50, 52 (1st Cir. 1997) (determining it was unnecessary to decide whether officers' failure to prevent private violence was an "affirmative act" because "[t]he issue of causation . . . in a section 1983 suit is based on basic notions of tort causation," and plaintiffs did not satisfy their burden to show that the officers' conduct was either the "cause in fact" or the legal, "proximate" cause of the deprivation); s*ee also Garcia-Gonzalez v. Puig-Morales*, 761 F.3d 81, 87 (1st Cir. 2014) ("There must be a causal connection between the defendant's conduct and the alleged deprivation" to establish Section 1983 liability).

It is therefore not enough to point to an affirmative act that may have contributed to the harm; if that were the causation standard for state-created danger claims, the causation element would merely repeat the separate requirement that the affirmative act be one which at minimum "enhances" the danger to the plaintiff, *see Welch,*12 F.4th at 76 (explaining that an affirmative act need not "greatly" enhance

the danger but rather must "simply 'enhance' the danger"); *Irish II*, 979 F.3d at 75 (establishing causation as a distinct element from whether the affirmative act created or enhanced a danger); *cf. Ye v. United States*, 484 F.3d 634, 642–43 (3d Cir. 2007) (incorporating the but-for causation standard into the requirement that a state actor must affirmatively act to create danger or to render a plaintiff more vulnerable thereto).

As the District Court explained, *see* Add. 46-48, this Court's jurisprudence on causation in the state-created danger context demonstrates that a showing of increased risk alone is not enough, *compare Rivera*, 402 F.3d at 37–38 (officers' failure to provide protection to government witness was not the cause of the witness's death because "merely rendering a person more vulnerable to risk does not create a constitutional duty to protect") *with Irish II*, 979 F.3d at 67–68 (investigating officers could have caused the private harm to plaintiff when they tipped off a suspect that plaintiff had reported him and suspect thereafter kidnapped and raped the plaintiff).

The causation requirement thus demands but-for and proximate cause to show a state-created danger claim and establish liability under Section 1983. *See Murguia v. Langdon*, 61 F.4th 1096, 1111 (9th Cir. 2023) ("[A] plaintiff must show that the officers' affirmative actions created or exposed him to an actual, particularized danger that he would not otherwise have faced." (quotations omitted)); *Kaucher v.*

*Cnty. of Bucks*, 455 F.3d 418, 432–33 n.10 (3d Cir. 2006) (explaining that but-for causation is necessary because it is "[o]nly then [that] the plaintiff will be more vulnerable to danger than had the state not acted at all" (quotations omitted)); *Hart v. City of Little Rock*, 432 F.3d 801, 805 (8th Cir. 2005) (explaining that a state created danger claim may lie if "the state acts affirmatively to place someone in a position of danger that he or she would not otherwise have faced").

Indeed, the state-created danger doctrine is an exception that has been carved out from the Supreme Court's observation in *Deshaney* that the State, which committed no due process violation in that case, had "placed [the plaintiff] in no worse position than that in which he would have been had [the State] not acted at all." 489 U.S. at 201. But-for and proximate causation thus account for the fact that liability will only flow from a state actor's failure to prevent private violence when the actor's conduct does indeed cause harm that otherwise would not have occurred if not for the affirmative act. Moreover, given that the Due Process Clause generally "does not require the state to protect citizens from 'private violence' in whatever form," *Souza v. Pina*, 53 F.3d 423, 427 (1st Cir. 1995), but-for and proximate causation serve as necessary limiting principles so the exception does not swallow the rule.

It was therefore Cohen's burden to establish facts in the summary judgment record from which a juror could conclude that Cohen would not have died of

hypothermia or drowning if Giroux had not made the verbal remark. *See Pina v. Child.'s Place*, 740 F.3d 785, 795–96 (1st Cir. 2014) (party that has the ultimate burden of proof "must present 'definite, competent evidence' sufficient to establish the elements of [his] claim" to survive summary judgment). Cohen did not meet this burden, relying instead only on the argument that Giroux may have increased the risk to Cohen. But even a showing of increased risk is not enough, *see Rivera*, 402 F.3d at 37–38, and the court properly concluded that Giroux "did not alter the status quo in a way that amounts to causation," Add. 48.

Whatever the contours of the causation requirement in the state-created danger context, it is not met here on this summary judgment record, which undisputedly shows that the cause of Cohen's death was hypothermia and drowning. As the District Court agreed, Add. 49, proof that the affirmative act caused the private harm exceeds the realm of common knowledge when such harm is not inflicted by a third party, as in *Irish* and *Johnson*, but is instead, as in here, the result of medical effects. *Compare Johnson v. City of Biddeford*, 665 F.Supp.3d 82, 91-98, 106 (D. Me. 2023) (concluding that the "sequence of events" could support a finding of causation when officer made a landlord more agitated and the landlord immediately thereafter shot and killed tenants), *aff'd on other grounds*, 92 F.4th 367; *with Daggett v. York Cnty.*, No. 2:18-cv-00303, 2021 WL 868713, at *37-38, *47–49 (D. Me. March 8, 2021) (finding summary judgment for defendants on state-

created danger claim because medical expert testimony was necessary to show that plaintiff's injuries resulted from officers' failure to deliver proper dose of medication), *aff'd on other grounds*, No. 21-1374, 2022 WL 216565, at *2 (1st Cir. Jan. 25, 2022) (noting that, if the state-created-danger doctrine applied, plaintiff would nevertheless fail on the causation prong); *see also* Add. 49.

Unaided by any expert testimony, Cohen's argument that the record supports an inference that Cohen would have walked out of the water based on the facts that Cohen was in shallow water and was "begging to be saved," Blue Br. 20-21, greatly oversimplifies and ignores both the causation issues, including the complex questions of medical causation, presented by his claim:

> [A] jury would have to find that Cohen could have made the deliberate choice to come to shore while in a state of alleged psychosis, would have been able to get himself to shore after having been in the cold water for twenty minutes already, could have done so faster than the rescue boat ultimately did, and would not have died of hypothermia or drowning if he had started for the shore at the time the comment was made.

Add. 48-49. Despite these issues and record evidence that Cohen was rescued three minutes after the remark and had been in the water for twenty minutes in a state of psychosis prior to the remark, *see* App. 116-17, ¶ 4-5, 9; App. 147-48, ¶¶ 3, 9, 12, 14, he asks this Court to hold that the record supports concluding that Cohen would have started walking to shore at the time the comment was made and that he furthermore would not have died of hypothermia or drowning had he done so at that

time. The District Court properly rejected this argument because it relies on impermissible speculation and because, absent proof of causation, the mere showing of "increased risk is not itself a deprivation of life, liberty, or property," *Rivera*, 402 F.3d at 37–38. This Court should affirm judgment for Giroux for these same reasons.

### B. Giroux's conduct was not conscience-shocking as a matter of law.

This Court can alternatively affirm judgment in favor of Giroux because the record shows that Giroux's conduct, viewed in total, was not conscience-shocking. This culpability requirement demands analysis of more than just the affirmative act; Giroux's conduct must be "viewed in total," and Cohen must show that Giroux's conduct as a whole "shocks the conscience." *Irish II*, 979 F.3d at 75. That showing requires Cohen to meet an "extremely high" burden that the record here does not support. *J.R. v. Gloria*, 593 F.3d 73, 80 (1st Cir. 2010). Indeed, "[n]ot every negligent, or even willfully reckless, state action that renders a person more vulnerable to danger takes on the added character of a violation of the federal constitution." *Soto,* 103 F.3d at 1064; *see also Souza*, 53 F.3d at 427 ("A government official's plainly despicable and wrongful conduct does not necessarily give rise to a recoverable federal civil rights claim."). "The burden to show state conduct that 'shocks the conscience'" therefore "require[es] stunning evidence of arbitrariness and caprice that extends beyond mere violations of state law, even violations

resulting from bad faith[,] to something more egregious and more extreme." *Gloria*, 593 F.3d at 80 (quotation marks omitted).

Here, the undisputed facts show that Giroux's conduct while he stood by the off-ramp, ready to deploy rescue equipment, does not rise to that "stunning" level. First, the affirmative act indisputably does not involve "extreme or intrusive physical contact" that this Court has occasionally deemed conscience-shocking, *see Souza*, 53 F.3d at 427, nor does the verbal comment rise to the level of egregiousness as that of other circumstances involving verbal threats that this Court has deemed *insufficient* to show a violation of due process, *see id*. at 424, 426–28 (holding that conduct of prosecutors was not conscience-shocking when prosecutors "exacerbated" a murder suspect's suicidal tendencies by encouraging the media to link the suspect to a series of murders); *Pittsley v. Warish*, 927 F.2d 3, 5–7 (1st Cir. 1991) (concluding that conduct of officers, who threatened to kill plaintiff and told plaintiff's children that they would never see their father again, did not shock the conscience because "single threat made by the officers" was insufficient), *overruled in part on other grounds by Martínez v. Cui*, 608 F.3d 54, 63–65 (1st Cir. 2010).

Second, the comment was said within seventy seconds of Giroux's arrival on scene in the context of what Giroux knew only to be a stressful situation in which authorities were attempting to apprehend a suspect who had fled into the water after committing an assault. App. 117, ¶ 9; App. 120, ¶ 17; App. 146–47, ¶¶ 2, 9. The

singular, verbal act here in a pressurized environment is therefore distinguishable from scenarios where officials make deliberate, unhurried judgments, *cf. Gloria*, 593 F.3d at 80-81 (applying the deliberate indifference standard where social workers were not responding to an emergency and had time to reflect), and a standard higher than deliberate indifference is thus required. In fact, all of Giroux's conduct during his brief time on scene was reactionary in response to a rescue scene for which he possessed limited knowledge. *See* App. 148, ¶¶ 11-12; App. 75-76, ¶¶ 16-17; *cf. Lewis*, 523 U.S. at 849 ("[C]onduct *intended* to injure . . . is the sort of official action most likely to rise to the conscience-shocking level." (emphasis supplied)). Viewing Giroux's conduct as a whole, this singular, verbal remark was not conscience-shocking.

### C. Alternatively, Giroux is entitled to Qualified immunity.

This Court can alternatively affirm judgment for Giroux based on the second prong of the qualified immunity analysis because the substantive due process right at issue here was not clearly established as of April 2020.

First, there is no controlling or persuasive authority sufficient to put a firefighter, such as Giroux, on notice that his singular statement violated a constitutional right under these circumstances where the "private danger"—the cold water in which Cohen remained—was not instigated by the state actor and the state actor was moreover contributing to the effort to rescue him from that danger. *See*

*Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (instructing courts to consider whether the "violative nature of particular conduct is clearly established" (quotation marks omitted)).

As discussed in Part I-C, *supra*, this Court has "only contemplated the [state-created danger] doctrine in the context of harm perpetrated by private actors, where law enforcement officers may have played a role in creating or enhancing the harm by those private actors." *Ablordeppey*, 85 F.4th at 34 (citing *Irish II*, 979 F.3d at 67–68, *Welch*, 12 F.4th at 72, and *Rivera*, 402 F.3d at 30). This Court's "precedents are thus worlds apart from the particular circumstances" here, *Ablordeppey*, 85 F.4th at 34 (governing law did not make it clear that private danger posed by "rapidly evolving situation in the face of a global pandemic" would create due process duty to protect), and there is no case law from this Court finding a singular, verbal comment to be conscience-shocking when uttered in a hurried and stressful circumstance, whether that be a rescue scenario or otherwise.

Second, it is not clear that every reasonable firefighter would have understood that this comment alone would violate Cohen's due process rights. To start, it is not clear that the verbal comment would give rise to the exceptional constitutional duty to protect even if it "exacerbated" danger to Cohen. *See Souza*, 53 F.3d at 427 (officers' acts did not give rise to the constitutional duty to protect even though those acts may have exacerbated the plaintiff's suicidal tendencies); *see also Hasenfus*,

175 F.3d at 69–70, 72 (1st Cir. 1999) (holding that the failure to render aid to a person who is already in danger does not give rise to a substantive due process claim). The undisputed facts show that Cohen was pulled out of the water approximately three minutes after the comment was made while Giroux was providing rescue equipment to individuals on shore. App. 117, ¶ 9; App. 119, ¶ 12; App. 147-48, ¶¶ 9, 14; *see Johnson*, 92 F.4th at 377 (officer entitled to qualified immunity when the entirety of his statements and conduct demonstrated that he reasonably could have believed that he would not create or enhance a danger to plaintiff).

Plaintiff cannot show that the law as of April 2020 clearly established that one verbal comment said while rendering rescue services would create the exceptional affirmative duty to provide *successful* rescue assistance when an individual placed themselves in that very rescue scenario and rescue was indeed attempted. *See Brown,* 318 F.3d at 478 (no affirmative obligation to provide competent rescue services when the State chooses to provide them). As this Court has acknowledged, it is unclear whether and how the state-created danger doctrine applies outside the third-party violence context. *See Ablordeppey*, 85 F.4th at 34. Because the law was not clearly established, Giroux is entitled to qualified immunity.

## III. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO THE CITY

The municipal liability claim is based on the City's alleged failure to train its police officers. Add. 51. To establish liability against the City, Cohen first had to

demonstrate that a Portland police officer violated Cohen's constitutional rights. *See, e.g., Collins v. City of Harker Heights*, 503 U.S. 115, 123–24 (1992) ("[I]f a city employee violates another's constitutional rights, the city may be liable if it had a policy or custom of failing to train its employees and that failure to train caused the constitutional violation."). While the District Court questioned whether Cohen had adequately demonstrated an underlying constitutional violation by a Portland police officer, the court assumed he had "for the sake of efficiency" in ruling on the City's Motion for Summary Judgment. App. 53. However, the court held that the municipal liability claim failed as a matter of law because Cohen had not created triable issues on whether: (1) there was a pattern of violations or other evidence of deliberate indifference; (2) the City failed to train officers on the relevant topics; and (3) there was a causal link between any lack of training and any constitutional violation. Add. 53.

On appeal, Cohen argues that the videos and the training records of two previously dismissed officers were sufficient to create a dispute of fact as to the City's failure to train its officers in dealing with an individual suffering a "psychotic event in the frigid waters." Blue Br. 22. This argument must fail in light of Supreme Court and First Circuit precedent establishing the standards for deliberate indifference and causation.

**A. There is no evidence of a pattern of prior similar constitutional violations.**

A claim that a municipality violated the Constitution through its failure to train employees requires a showing that the failure to provide training demonstrated "deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quotations omitted). A finding of deliberate indifference requires a showing that municipal policymakers had "actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights." *Id.* The deliberate indifference requirement for failure to train claims is typically demonstrated through a pattern of prior, similar, constitutional violations by untrained employees. *Id.* at 62.

Cohen points to evidence showing that Gervais and Rand did not receive annual mental health intervention proficiency training in support of a "pattern of deliberate indifference to the lack of training of the officers involved in this case." Blue Br. 24, 30. Thus, Cohen's "pattern" is an alleged pattern of the City's training. This argument reflects a fundamental misunderstanding of the requisite pattern evidence, which is a mechanism to demonstrate deliberate indifference – shown when municipal policymakers had "actual or constructive notice that a particular omission in their training program cause[d] city employees to violate citizens' constitutional rights." *Connick*, 563 U.S. at 61. Evidence of repeated, prior, similar constitutional violations can satisfy that notice requirement because such violations would presumably alert policymakers of the potential need for additional or different training, thereby

demonstrating a deliberate choice by a municipality. *See City of Canton v. Harris*, 489 U.S. 378, 389 (1989).

Here, the summary judgment record does not show any deliberate choice by the City. Indeed, instead of offering evidence of a pattern of prior, similar, constitutional violations, Cohen points to the training itself as a pattern. However, even assuming two officers' records can establish a "pattern," a pattern of training, without more, does not demonstrate that the City made a deliberate choice despite knowledge that its training was deficient. Indeed, Cohen's argument, at its core, is that the officers should have received more or better mental health crisis training. That argument has consistently been rejected. *See Connick*, 563 U.S. at 68; *Harris*, 489 U.S. at 390 (insufficient to simply prove "[t]hat a particular officer [was] unsatisfactorily trained" or "that an injury or accident could have been avoided if an officer had better or more training"); *Calvi v. Knox Cnty.*, 470 F.3d 422, 429 (1st Cir. 2006) (rejecting failure to train claim where no evidence presented that police force, overall, was inadequately trained).

There is no record evidence of prior, similar complaints or incidents that could have put the City on notice that a new program of training was necessary. App. 60-61, ¶¶ 47-48. A reasonable jury therefore could not conclude that the City made a conscious choice not to change its training program despite notice of deficiencies leading to constitutional violations. The only evidence of police interactions with persons in a mental health crisis fleeing into the water after committing violent assaults

45

is this incident involving Cohen. That alone cannot be used to establish a pattern for purposes of meeting the deliberate indifference standard. *See, e.g., Gray v. Cummings*, 917 F.3d 1, 13–14 (1st Cir. 2019) (holding that failure to train claim based on officer training on protocols for interacting with persons suffering from mental illness failed because plaintiff did not provide evidence of past violations sufficient to put the town on notice).

As the District Court properly concluded, Cohen failed to deduce any pattern evidence. Accordingly, Cohen had to demonstrate deliberate indifference in another way, which he failed to do.

**B. Cohen cannot fit within the single-incident liability theory.**

The Supreme Court has "left open the possibility that, 'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference." *Connick*, 563 U.S. at 63 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409–10 (1997). In *Canton*, the Supreme Court hypothesized about the rare, so-called single-incident liability where the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations. 489 U.S. at 390, n.10. The hypothetical situation in *Canton* involved a city arming police officers with firearms without providing them with *any* training on the constitutional constraints of the use of deadly force. *Id.* In that scenario, given "the

known frequency with which police attempt to arrest fleeing felons and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights," there is an obvious need for some form of training because, without it, there is no way for new officers to know the constitutional knowledge they require. *Connick*, 563 U.S. at 63 (quoting *Bryan Cnty.*, 520 U.S. at 409).

Cohen contends that the "clear and irrefutable video evidence" of the encounter with police that day is sufficient to establish that the need for more or different training was obvious. Blue Br. 28. However, the District Court properly concluded that Cohen did not fit within the narrow, single-incident theory because, unlike the hypothetical in *Canton*, where there was a complete absence of training in the face of an obvious need for training, the summary judgment record contains undisputed evidence of the City's extensive training program. Add. 56-57.

The record undisputably demonstrates that all Portland police officers initially receive comprehensive training on interacting with persons in crisis at the State's Maine Criminal Justice Academy through the mandatory basic training program. App. 50-51, ¶¶ 13-14. Portland officers receive additional training during their 14-week intensive field training program, and must also complete a 40-hour crisis intervention training (CIT) within one year of completing field training. App. 53-54, ¶¶ 22-26. CIT training is a comprehensive training program developed by the National Alliance on Mental Illness, focusing on best practices for law enforcement officers interacting with

persons in mental health crises. App. 54-55, ¶¶ 27-28. Portland also has a dedicated behavioral health unit that coordinates additional training for officers. App. 55-56, ¶¶ 29-30. Cohen may have preferred more or different training, but that alone cannot establish municipal liability.

In *Gray*, the plaintiff likewise attempted to overcome a lack of pattern evidence by offering expert testimony on appropriate policies for police interactions with people with disabilities and arguing that such expert testimony, combined with her own interaction with officers, was sufficient to create a triable fact as to the failure to train. 917 F.3d at 5–7. This Court rejected that argument, holding that, to survive summary judgment, she needed to produce evidence that the municipality "knew or had reason to believe that [its training program] had unconstitutional effects." *Id.* at 14. Here, the evidence is even thinner than in *Gray*. Cohen offers no expert testimony on appropriate police practices, nor does he offer testimony from anyone at the City or Portland Police Department related to its training or policies. Identifying faults in a municipality's training is not enough, *id.*, and Cohen therefore cannot generate a triable issue as to deliberate indifference.

Moreover, Cohen cannot rely on Gervais and Rand's training records because they were dismissed, and their conduct therefore cannot provide the basis for an underlying constitutional violation. *See Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 25–26 (1st Cir. 2005). Cohen fails to acknowledge that hurdle, instead

erroneously relying on the court's finding, at the motion to dismiss stage, that it could draw an inference of a failure to train as to the City. Blue Br. 29. However, the role of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Calvi*, 470 F.3d at 427. Cohen can no longer rest upon the allegations in his pleading, *Lopez-Hernandez v. Terumo Puerto Rico LLC*, 64 F.4th 22, 28 (1st Cir. 2023), and was required to introduce facts, supported by admissible record evidence, to fit within the single-incident theory, *see* Fed. R. Civ. P. 56(c)(1). Cohen did not introduce any such facts, and he thus failed to create a triable issue as to the City's deliberate indifference. Summary judgment in favor of the City on the failure to train claim should therefore be affirmed.[5]

### C. Cohen cannot establish a direct causal link between the City's alleged deficiency in training and the ultimate harm.

To survive summary judgment, Cohen also had to show that any alleged deficiencies in the City's training program caused Cohen's death. *Canton*, 489 U.S. at 390. The court correctly concluded that Cohen failed to generate a triable issue as

---

[5] Cohen ignores the undisputed facts that certified law enforcement officers in Maine are not rescue swimmers or EMTs, *see* App. 48-49, ¶¶ 7-9; App. 51-52, ¶¶ 16-20, which reflects a policy decision by the State and does not support an inference of deliberate indifference on the part of the City, *cf. Collins*, 503 U.S. at 128–29 ("Decisions concerning the allocation of resources to individual programs . . . and to particular aspects of those programs, such as the training [ ] of employees, involve a host of policy choices that must be made by locally elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country.").

to the causation requirement of a failure to train claim, and that without a "direct causal link," the City was entitled to summary judgment. Add. 59.

Cohen's challenge to the City's training focuses on the crisis intervention training (of two officers) but fails to offer any developed argument on causation or how additional training would have changed the outcome. Cohen ignores the complexity of the cold-water rescue and, by focusing only on the alleged deficiency in the City's mental health crisis intervention training, Cohen cannot demonstrate a direct causal link between the challenged policy and Cohen's ultimate injury. *Cf. Santiago v. Fenton*, 891 F.2d 373, 382 (1st Cir. 1989) (alleged inadequacy of training in constitutional law could not support inference that the policy of lack of awareness of citizen constitutional rights was the moving force behind plaintiff's arrest without probable cause).

Cohen again erroneously relies on the MTD Order to argue that he satisfied the causation standard, Blue Br. 31, in which the court inferred causation from the allegations in the FAC and Rand video. At the summary judgment stage, Cohen cannot rely on mere allegations; he must produce admissible record evidence, Fed. R. Civ. P. 56(c)(1). Here, however, apart from generally pointing to videos in his brief in an attempt to support causation, Blue Br. 32, he includes no citations to the record, nor are there any facts establishing a direct causal link properly set forth in the parties' respective statements as required under the Local Rule. *See generally* D.

Me. L.R. 56(b)-(f).  The mere fact that this incident occurred does not create a direct causal link between the City's alleged lack of training and Cohen's death. If that were the standard for causation, then municipalities would be liable under Section 1983 "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee." *Canton*, 489 U.S. at 392. Because Cohen failed to generate a material dispute of fact as to causation, the court properly held that the City was entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, the District Court's decision dismissing Rand and Gervais and granting summary judgment in favor of Giroux and the City should be affirmed.

Dated: March 7, 2024

*/s/ Kasia S. Park*
Kasia S. Park, Bar No. 1173974
Susan M. Weidner, Bar No. 1207944
*Attorneys for Defendant/Appellees*

**DRUMMOND WOODSUM**
84 Marginal Way, Suite 600
Portland, ME  04101-2480
Tel: (207) 772-1941
kpark@dwmlaw.com
sweidner@dwmlaw.com

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,827 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using serifs in Times New Roman 14 point font.


Dated: March 7, 2024          */s/ Kasia S. Park* _____
Kasia S. Park
First Circuit Bar No. 1173974
*Attorney for Defendant/Appellees*

**DRUMMOND WOODSUM**
84 Marginal Way, Suite 600
Portland, ME  04101-2480
Tel: (207) 772-1941
kpark@dwmlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2024, I electronically filed the Brief of Appellee with the U.S. Court of Appeals for the First Circuit by using the CM/ECF system which will send notification of such filing to all parties through their counsel of record.


Dated: March 7, 2024                         */s/ Kasia S. Park*

                                                  Kasia S. Park
                                                  First Circuit Bar No. 1173974
                                                  *Attorney for Defendants/Appellees*

**DRUMMOND WOODSUM**
84 Marginal Way, Suite 600
Portland, ME  04101-2480
Tel: (207) 772-1941
kpark@dwmlaw.com